# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Julia Dunham, as Administrator of the Estate of Cheyenne Dunham

**DEFENDANTS**
Centrus Energy Corp., United States Enrichment Corporation, Uranium Disposition Services, LLC., BWXT

**(b)** County of Residence of First Listed Plaintiff: Pike
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jason Leasure, Leasure & Oliver, PLLC
401 10th St., Ste 230, Huntington, WV 25701

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**TORTS — PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [x] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**TORTS — PERSONAL INJURY**
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS — Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

**Other:**
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC 2210

Brief description of cause:
Complaint for Public Liability Action Under the Price Anderson Act

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $** _____

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE _____    DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 11/24/2025 | /s/ Jason Leasure |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **JULIA DUNHAM,** as **ADMINISTRATOR OF THE ESTATE OF CHEYENNE DUNHAM,** an Ohio resident;<br><br>Plaintiff,<br><br>v.<br><br>**CENTRUS ENERGY CORP.**, a Delaware Corporation, individually and as successor-in interest to USEC Incorporated; **UNITED STATES ENRICHMENT CORPORATION,** a Delaware Corporation; **URANIUM DISPOSITION SERVICES, LLC,** a Tennessee Limited Liability Company; **BWXT CONVERSION SERVICES, LLC,** a Delaware Limited Liability Company; **BECHTEL JACOBS COMPANY, LLC,** a Delaware Limited Liability Company; **LATA/PARALLAX PORTSMOUTH, LLC,** a New Mexico Limited Liability Company; and **FLUOR-BWXT PORTSMOUTH, LLC,** an Ohio Limited Liability Company**,**<br><br>**Defendants**. | CASE NO.:<br><br>COMPLAINT FOR PUBLIC LIABILITY ACTION UNDER THE PRICE ANDERSON ACT<br><br>JURY DEMANDED |

Plaintiff, Julian Dunham, as Administrator of the Estate of Cheyenne Dunham, ("Plaintiff") alleges, upon information and belief:

## NATURE OF CASE

1. This is an action by Plaintiff Julia Dunham, Administrator of the Estate of Cheyenne Dunham, for Defendants' release of radiation causing Wrongful Death. Plaintiff is the mother of Cheyenne Dunham, and as such is entitled to bring this Wrongful Death

1

action pursuant to Ohio Revised Code Section 2125.02.

## PARTIES

2. Plaintiff, Julia Dunham, is above the age of majority. She is a resident of Pike County, Ohio.

3. Cheyenne Dunham was born on September 29, 1996. She died on November 25, 2015. Her mother, Julia Dunham was appointed as Administrator of Estate of Cheyenne Dunham on October 6, 2025.

### Gaseous Diffusion Plant and Centrifuge Plant Defendants

4. Defendant Centrus Energy Corp. ("Centrus"), formerly USEC Incorporated ("USEC Inc."), is a Delaware corporation with its principal place of business in Maryland. This action is brought against Centrus Energy Corp., individually, and as successor-in-interest to USEC Inc.

5. Defendant United States Enrichment Corporation ("USEC") is a Delaware corporation with its principal place of business in Maryland and is a wholly owned subsidiary of Centrus Energy Corp.

6. Defendants Centrus and USEC at all times relevant were required to meet the standards for radiation dose limits for individuals set forth in 10 C.F.R. § 20.1301.

### Depleted Uranium Hexafluoride Plant Defendants

7. Defendant Uranium Disposition Services, LLC ("UDS") is a Tennessee limited liability company with its principal place of business in Florida.

8. Defendant BWXT Conversion Services, LLC ("BWXT") is a Delaware limited liability company with its principal place of business in Kentucky.

9. Defendants UDS and BWXT were at all times relevant required to meet the standards for radiation dose limits for individuals set forth in 10 C.F.R. § 20.1301.

### Environmental Remediation and Waste Management Defendants

10. Defendant Bechtel Jacobs Company, LLC ("Bechtel Jacobs") is a Delaware limited liability company with its principal place of business in Tennessee.

11. Defendant Lata/Parallax Portsmouth, LLC ("Lata/Parallax") is a New Mexico limited liability company with its principal place of business in New Mexico.

12. Fluor-BWXT Portsmouth, LLC (Fluor-BWXT) is an Ohio limited liability company with its principal place of business in Ohio.

13. Defendants Bechtel Jacobs, Lata/Parallax, and Fluor-BWXT at all times relevant were required to meet the standards set forth in 10 C.F.R. § 20.1301.

### JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States, namely, the Price-Anderson Act (hereinafter "PAA"), 42, U.S.C. § 2210. This Court may also exercise subject matter jurisdiction over this action directly pursuant to Section 2210(n)(2) of the PAA. It provides that the United States District Court in the district where a nuclear incident takes place shall have original jurisdiction with respect to any public liability action arising out of, or resulting from, a nuclear incident.

15. Under the Price-Anderson Act, Ohio state law provides the "substantive rules for decision" in this action unless it is inconsistent with the provisions of 42 U.S.C. § 2210.

16. Venue is proper in this judicial district pursuant to 42 U.S.C. § 2210(n)(2) because the nuclear incidents giving rise to Plaintiff's claims took place in this district.

3

**INCIDENT FACTS**

17. Ounce for ounce, radioactive isotopes are the most toxic materials known to man.

18. Radiation is the emission or transmission of energy through space or material. Some materials spontaneously emit radiation through a process known as radioactive decay.

19. As these materials decay, they release radiation energy and transform into other materials which may then also decay by radiating energy and transforming into other materials.

20. Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, can penetrate other materials. When radiation energy interacts with other material, it causes ionization which can damage chemical structures. When ionizing radiation passes through human cells, it can damage those cells, resulting in mutations of genetic material. This can lead to cancer and other harms.

21. People are exposed to radiation in two ways: (a) external exposure from radioactive material in the environment and (b) internal exposure to radioactive material that has entered the body.

22. Radioactive material can be taken into the body by consuming food and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through the skin. For as long as it remains inside the body, the material taken in will internally irradiate a person's organs and tissues.

23. One characteristic of both internal and external exposure to ionizing radiation on the human body is that even if the energy absorbed is low, the biological effects can still be gravely serious. Another characteristic is that there are latent biological effects of radiation.

24. Illnesses such as cancers may take years to appear. Research shows that uranium has a high chemical affinity for DNA. It causes genetic damage to individuals resulting in birth defects and cancer at levels much greater than generally present in similar communities.

25. One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment. Radioactive materials decay over time.

26. Each radioactive material gives off radiation as it decays and transforms into a different material. The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate. For example, after one half-life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eighth of the original sample, and so forth.

27. Uranium is particularly hazardous because it has a combination of chemical and radioactive genotoxicity owing to its high chemical affinity for DNA, the acknowledged target for the genetic and genomic effects which cause cancer. These effects are especially relevant to inhaled Uranium.

28. The toxic and carcinogenic effects of exposure to radioactive materials have been a matter of general scientific knowledge since the early 20th Century.

**Gaseous Diffusion Plant**

29. Located in Pike County, Ohio, is the 3,777-acre Portsmouth Site ("PORTS"). Uranium enrichment operations were performed there by the Defendants for many decades.

30. Located at PORTS is the Portsmouth Gaseous Diffusion Plant, or the "A-Plant", as the locals refer to it. In July 1993, the USEC assumed the uranium enrichment operations at the Portsmouth Gaseous Diffusion Plant. It operated the plant until 2001.

31. The primary mode of enrichment was the gaseous diffusion of uranium hexafluoride to separate the lighter fissile isotope, U-235, from the heavier non-fissile isotope, U- 238.

32. From 2001 to 2011, Defendant USEC was responsible for safely maintaining the A-Plant. Initially, the process equipment was kept in Cold Standby, capable of restarting if the need arose. Eventually, the plant transitioned to Cold Shutdown where systems were permanently disengaged, and equipment prepared for eventual decommissioning.

### Depleted Uranium Hexafluoride Conversion Plant

33. In 2002, Defendant UDS was contracted to design, build, and operate a Depleted Hexafluoride Conversion Plant ("DUF6 Conversion Plant"). Depleted uranium hexafluoride ("DUF6") is a coproduct of the uranium enrichment process that occurred at PORTS.

34. The DUF6 Conversion Plant was designed and constructed to convert the DUF6 produced by both the Paducah and the Portsmouth Gaseous Diffusion Plants to a more stable uranium oxide form for reuse, storage, and/or transportation and disposition. A co-product of the conversion process is hydrofluoric acid, which is reused industrially.

35. In 2010, Defendant Fluor-BWXT was contracted to operate the DUF6 Conversion Plant at the Portsmouth Site. Flour-BWXT was also responsible for continuing cylinder surveillance and maintenance services for the radioactive inventory of DUF6, low-enrichment uranium hexafluoride, normal UF6, and other cylinders.

**Centrifuge Operations**

36. In 2002, USEC signed a lease for use of centrifuge-related equipment and facilities at PORTS.

37. In 2004, USEC began operating what is known as the American Centrifuge Lead Cascade Facility ("Lead Cascade"). The Lead Cascade was a test loop that demonstrated the effectiveness of centrifuge design and equipment by processing uranium in a closed loop.

38. USEC's successor, Centrus, ceased uranium enrichment operations at the Lead Cascade. This was followed by the removal of uranium gas from the centrifuges and process piping, dismantling of equipment, and other actions needed to ultimately decommission the facility. The Lead Cascade is currently in the decommissioning phase.

39. The Lead Cascade was a test loop for USEC's, now Centrus' American Centrifuge Plant ("ACP"). Construction began in 2007 at PORTS but stopped in 2009.

40. Centrus' centrifuge operations are carried out pursuant to source materials licenses which allow for the possession of radioactive material but do not allow for the disposal of radioactive material via air dispersion into the surrounding community.

**Environmental Remediation and Waste Management**

41. Environmental cleanup at PORTS began in 1989, has been continuous, and continues today.

42. Between 1997 and 2005, Bechtel Jacobs was responsible for environmental remediation at PORTS.

43. Between 2005 and 2010, LATA/Parallax was responsible for environmental remediation at PORTS.

7

44. LATA/Parallax was responsible for groundwater and soil remedial actions, removing legacy waste, decontamination and decommissioning ("D&D") facilities, highly enriched uranium disposition, operating the site waste storage facilities, and surveillance and maintenance activities, as well as other activities.

45. From 2010 to 2024, Fluor-BWXT was responsible for environmental remediation at PORTS.

### Releases and Statistically Significant Increase in Cancer

46. Reports by DOE, NIOSH, and EPA demonstrate that there have been multiple releases of contaminants from PORTS, including both radioactive and/or hazardous contaminants, into the water, air, and soil in violation of federal statutes and/or regulations. Radioactive materials and toxic metals can be found deposited in soil, surface water, and buildings in and around PORTS in Piketon, Ohio.

47. Recent scientific testing performed at locations adjacent to PORTS on publicly accessible areas supports a conclusion that external radiation levels exceed the allowable level of exposure to members of the public under federal regulations, including, but not limited to, more than 100 millirems above background levels in a calendar year.

48. Analysis of cancer rates for all cancers combined in the Census Tracts adjacent to the plant show statistical significance. Specifically, a 60% excess rate for all cancer types between 2011 and 2016, based on national and local cancer data.

49. The counties which contain and are adjacent to the plant, namely Pike, Scioto, Vinton, Adams, and Lawrence Counties, are among those having the highest cancer rates in Ohio.

50. A preliminary review of statewide cancer data recently obtained from the Ohio Department of Health revealed a large excess of childhood blood cancer in the area immediately surrounding the plant.

51. Specifically, in the five census block groups closest to the plant, Plaintiff's experts found 13 diagnoses for leukemia and lymphoma under the age of 25 from 1996 to 2017 in a population of only 2,652.

52. Statistics provided by the Ohio Department of Health place the incidence of leukemia and lymphoma for those under the age of 25 living within these five census block groups at 4.9 cases per 100,000, compared to 1.62 cases per 100,000 in comparison populations.

53. A recent study by Northern Arizona University determined that offsite in the PORTS area: (a) Enriched Uranium is found in surface waters, sediments, and interior dust consistent with the operations at the PORTS; (b) Non-fallout $^{237}$Np (Neptunium) and Pu (Plutonium) isotopes are found in bed sediments, suspended sediments, and interior dust; (c) Non-fallout $^{237}$Np (Neptunium) is found in sediments of an unnamed creek that is draining a landfill construction area that is currently being worked; (d) Enriched Uranium is found in interior spaces of Zahn's Corner Middle School and in attic dust; (e) Emissions from the Portsmouth Site account for the enriched contents of Uranium, Neptunium, and Plutonium encountered in environmental samples. *See Exhibit 1*: Michael E. Ketterer, *Investigation of Anthropogenic Uranium, Neptunium and Plutonium in Environmental Samples Near Piketon, Ohio*, April 27, 2019.

54. Plaintiff's experts have undertaken an initial statistical analysis showing clear evidence of excess cancer rates by comparing 12 other randomly selected areas of similar

9

size in Ohio. Dr. Carl Werntz, an epidemiologist, has reviewed the cancer data collected by the Ohio Department of Health. Dr. Werntz has concluded that, based on a preliminary review, the childhood blood cancer incident rate for the area around the plant was triple the average incident rate compared to the 12 randomly selected areas, even though three of the randomly selected areas contained significant point sources of contamination. Additional statistical analysis and on-site sampling (which Defendants have vigorously opposed in previously filed cases) is required to fully characterize the cancer threat. *See Exhibit 2*.

55. Defendants could have prevented or mitigated the offsite impact with better precautionary measures, compliance with applicable regulations, and the use of reasonable care. The harm posed could have been reduced or avoided by reasonable instructions or warnings when it became clear that toxins had been released into the environment.

**Death of a Child**

56. Approximately two miles from PORTS is Zahn's Corner Middle School. The school served more than 300 students in the Piketon community for many years, including Cheyenne Dunham.

57. On May 13, 2019, Zahn's Corner Middle School in Piketon was suddenly closed due to health concerns because enriched uranium was detected inside the building.

58. Following the closure of the Zahn's Corner Middle School, fencing was placed around the school property warning of radioactive material.

59. Neptunium-237 was also detected by an air monitor next to the school. The school is approximately two miles from PORTS and was attended by thousands of students over the previous decades.

60. Cheyenne Dunham was a student at Zahn's Corner Middle School for three years, from fourth through sixth grade. While at Zahn's Corner, Cheyenne was exposed to radionuclides in excess of federal regulatory limits. She was also exposed to radionuclides in the Piketon community.

61. Cheyenne Dunham lived from birth until age four or five at a house located at 257 Bailey Chapel Road in Piketon, Ohio, which bordered PORTS.

62. Cheyenne Dunham attended kindergarten through third grade at Jasper Elementary, which is in close proximity to PORTS,

63. Cheyenne Dunham lived from age four or five until she was a teenager at a second house on 1777 Bailey Chapel Road in Piketon, Ohio–which is in close proximity to PORTS.  At this home, Cheyenne Dunham played in a creek and ingested creek water.

64. When she was a teenager, Cheyenne Dunham moved to Waverly, Ohio.

65. Cheyenne Dunham, from birth until she was a teenager, regularly consumed food grown in a garden within close proximity to PORTS, including corn, tomatoes and beans.

66. When Cheyenne Dunham was about 16 years old, she began to experience health problems.  One day her legs turned blue.  While Plaintiff did not understand Cheyenne's condition, she took her to SOMC Waverly Family Health Center, where she was immediately transferred to the emergency room at Southern Ohio Medical Center ("SOMC") in Portsmouth, Ohio.  While she was at SOMC, Cheyenne was diagnosed with blood clots in her legs, including a 12-inch blood clot in her left hip.  Cheyenne also had blood clots in her lungs.

11

67. Cheyenne Dunham was given blood thinners and referred to Cincinnati Children's Hospital Medical Center ("Cincinatti Children's Hospital").

68. At Cincinnati Children's Hospital, she was diagnosed with GATA Deficiency, a rare condition that affects the blood and the immune system.

69. To treat this rare condition, Cheyenne Dunham underwent two separate bone marrow transplants, in an attempt to avoid developing Acute Myeloid Leukemia, which was likely to result in death. Following the second bone marrow transplant in February of 2015, Cheyenne became very sick. By May of 2015, her body was rejecting the bone marrow transplant, and her liver cells were under attack. She was in pain and struggled for months before her death.

70. At Cincinnati Children's Hospital, Cheyenne Dunham was pronounced dead on November 25, 2015. The immediate cause of death was GVHD or Graft-versus-Host Disease, as a consequence of a Bone Marrow Transplant and GATA 1 Mutation. *See, Death Certificate at Exhibit 3*. Cheyenne Dunham was just 19 years old.

71. Cheyenne Dunham suffered from chronic fatigue, weakness, constant infections, fear of infections, including multiple blood and iron infusions. As a result of her rare condition and subsequent treatment, Cheyenne ultimately died. Her death was directly and proximately a result from her exposure to radionuclides released from PORTS in excess of federal regulatory limits.

72. At no time following Cheyenne Dunham's diagnosis did Plaintiff, Julia Dunham or Cheyenne Dunham know, nor should Plaintiff or Cheyenne Dunham have reasonably known, that Cheyenne Dunham's chronic diseases and death were related to radiation exposure resulting from Defendants' violations of federal regulations, because no

competent medical authority ever informed Plaintiff, Julia Dunham or Cheyenne Dunham of any such relationship.

73. Further, Plaintiff, Julia Dunham did not know, nor should she have known by exercising reasonable diligence of any factual or scientific basis establishing a causal relationship between Cheyenne Dunham's medical conditions that caused her death and radiation exposure, because any such causal relationship can only be established by complex, costly and time-consuming expert analysis well beyond the means or abilities of an ordinary person.

74. Similarly, Plaintiff, Julia Dunham did not know, nor should she have known by exercising reasonable diligence that Cheyenne Dunham had ever been exposed to radionuclides from PORTS in excess of federal regulatory limits. Let alone at doses sufficient to cause bodily injury of any kind, because exposure and dose can only be established by complex, costly and time-consuming expert testing and analysis well beyond the means or abilities of an ordinary person.

75. Accordingly, Plaintiff's claims were and are timely under Ohio Revised Code § 2305.10(B)(1) and the PAA.

### CAUSE OF ACTION

**(Public Liability Action Under the Price Anderson Act)**

76. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

77. Defendants released radiation into the environment in excess of federal regulatory limits, including 10 C.F.R. 20.1301. Cheyenne Dunham was exposed to radiation in excess of these limits.

78. Cheyenne Dunham was exposed to the radiation released by the Defendants.

79. Cheyenne Dunham has suffered injuries, including bodily injury, disease, and wrongful death.

80. The radiation released by the Defendants was the cause of Cheyenne Dunham's injuries, including her untimely death.

81. Defendants Centrus and USEC released radiation that exposed the Cheyenne Dunham to radiation in excess of 10 C.F.R. § 20.1301 by: (a) failing to shut down the gaseous diffusion plant properly thereby negligently concentrating dangerous radionuclides which later were released into the environment during the subsequent remediation of the gaseous diffusion facilities; and, (b) failing to properly design, manage, and implement the remediation efforts throughout the PORTS facility which has allowed airborne particulate matter containing radionuclides to expose Cheyenne Dunham to harmful radiation; and (c) failing to properly design, manage, and implement the operation and remediation of the depleted uranium operations.

82. Defendants UDS and BWXT Conversion Services released radiation and contributed to the overexposure to radiation by (a) failing to properly contain airborne particulate matter associated with Depleted Uranium operations; and (b) failing to contain numerous leaks, emissions, and releases during operations, where those releases contained Uranium-238, which later decayed into Lead-210, Thorium-230, Radium-226, and Polonium-210, which now contaminates the community surrounding PORTS.

83. Defendants, Bechtel Jacobs, Lata/Parallax and Fluor-BWXT released radiation and contributed to the overexposure to radiation by failing to properly contain enormous clouds of dust and excessive airborne particulate matter containing Uranium-238,

14

Uranium-235, Uranium-234, Neptunium- 237, Plutonium-238, Lead-210, Thorium-230, Radium-226, and Polonium-210 during their remediation work.

84. Defendants named herein are all engaged in operations at PORTS which are part of the uranium fuel cycle and/or the nuclear fuel cycle.

## JURY DEMAND

85. Plaintiff hereby demands trial by jury on all causes of action to which he is entitled.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for a Jury Trial and for the following relief:

a. An award of damages for funeral and burial expenses for the decedent, Cheyenne Dunham;

b. An award of damages for medical expenses for the treatment and care of the decedent, Cheyenne Dunham for the injuries resulting in her death;

c. An award of damages for the great pain, suffering, annoyance, aggravation, fear and inconvenience the decedent, Cheyenne Dunham suffered prior to her death;

d. An award of damages for the years of life for which the decedent, Cheyenne Dunham was deprived;

e. A finding that Defendants are jointly and severally liable to Cheyenne Dunham for any and all damages, whether found or awarded by the Court or a jury;

f. An award for the loss of Cheyenne Dunham's services; society, including, loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education; sorrow; and mental anguish and emotional trauma to her surviving parents and siblings;

15

g. All other damages which are allowed by law, based upon the allegations set forth herein and the evidence admitted at the trial of this matter;

h. Prejudgment and post-judgment interest;

i. An order directing Defendants to pay for the costs of this proceeding, including reasonable attorneys' fees and costs, including, but not limited to, costs as permitted by law; and

j. Such other relief as the Court or jury may deem appropriate.

DATED: November 24, 2025                LEASURE OLIVER, PLLC

*/s/ Jason A. Leasure*
Ohio State Bar No.: 0081684
Mathew R. Oliver
Ohio State Bar No. 0097318
401 10th St., Suite 230
Huntington, WV 25701
Telephone: (304) 521-4042
Email: jason@304carwreck.com

**UNDERWOOD LAW OFFICE, INC.**
Mark F. Underwood
Texas State Bar No.: 24059341
Southern Dist. of TX Bar No. 2601475
2530 West White Avenue, Suite 200
McKinney, Texas 75071
J. Patrick L. Stephens
WV State Bar No: 10262
923 Third Avenue
Huntington, WV 25701
Telephone (972) 535-6377
Facsimile (800) 991-4384
munderwood@underwoodlawoffices.com
pstephens@underwoodlawoffices.com
*Pro Hac Vice Motion forthcoming*

**THOMPSON BARNEY**
Kevin W. Thompson
West Virginia State Bar No.: 5062
David R. Barney, Jr. (WV State Bar No. 7958)
2030 Kanawha Boulevard, East
Charleston, WV  25311
Telephone: (304) 343-4401
Facsimile: (304) 343-4405
kwthompsonwv@gmail.com
drbarneywv@gmail.com
*Pro Hac Vice Motion forthcoming*

**COOPER LAW FIRM, LLC**
Victor Cobb
Matthew Camm
824 Elmwood Park Blvd., Suite 130
Harahan, LA 70123
Telephone: (504) 399-0009
Facsimile: (505) 309-6989
vcobb@clfnola.com
mcamm@clfnola.com
*Pro Hac Vice Motion forthcoming*

**ATTORNEYS FOR PLAINTIFF**

17